**2023 BNH 003**          **Note:  This is an unreported opinion.  Refer to LBR 1050-1 regarding citation.**
_____

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF NEW HAMPSHIRE

In re:                                                    Bk. No. 20-10963-BAH
                                                          Chapter 7
Jonathan D. Keevers,
          Debtor

Shawna F. Keevers                                         Bk. No. 22-10088-BAH
          Debtor                                          Chapter 7


Berkley Insurance Company,
          Plaintiff

v.                                                        Adv. No. 21-01032-BAH

Jonathan D. Keevers and
Shawna F. Keevers,
          Defendants


*Attorney for Plaintiff*
*Peter C. Netburn, Esq.*
*Clyde & Co US LLP*
*Boston, Massachusetts*


*Attorney for Defendants*
*Michael B. Feinman, Esq.*
*Feinman Law Offices*
*Andover, Massachusetts*


# **MEMORANDUM OPINION**

I.      **INTRODUCTION**

Berkley Insurance Company ("Berkley") commenced this adversary proceeding seeking to deny Debtors Jonathan D. Keevers and Shawna F. Keevers (collectively, the "Debtors")[1] a discharge in their respective chapter 7 cases[2] under Bankruptcy Code §§ 727(a)(3), (a)(4), and (a)(6) (Doc. No. 1) (the "Complaint").[3]  Although the Complaint asserts three separate causes of action, each count revolves around the Debtors' nondisclosure or piecemeal disclosure of financial information and documents relating to their personal income and expenses, and their use of a separate business entity (and the entity's bank account) to allegedly hide personal income and expenses from their creditors.

The Court held a two-day trial on the Complaint on November 3 and November 4, 2022. During the trial, Berkely characterized the Debtors' pre-petition and post-petition conduct as evincing a reckless indifference to the truth and a disregard of their disclosure obligations at best, or a knowingly fraudulent scheme to defraud their creditors and defy the Court's orders at worst. The Debtors vigorously denied these allegations, asserting that they acted in good faith throughout their chapter 11 case and endeavored to comply with what they understood to be their disclosure obligations as individual debtors under both the Bankruptcy Code and the Court's orders.

---

[1] For the sake of clarity and to promote the readability of this opinion, the Court shall use the Debtors' first names when referring to them in their individual capacities.

[2] The Court entered an order severing the Debtors' chapter 7 case on March 2, 2022 (Bk. No. 20-10963-BAH, Doc. No. 287).  Pursuant to that order, Shawna was assigned a new case number.  See Bk. No. 22-10088-BAH.  For purposes of this opinion, references to the "Bankruptcy Case" or "Bankruptcy Docket" shall refer to Bk. No. 20-10963-BAH and the docket therein, respectively.

[3] Unless otherwise indicated, the terms "Bankruptcy Code," "chapter," "section" and "§" refer to the provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq.  Reference to the "Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure.

For the reasons explained below, and after consideration of the relevant filings, the testimony given during the trial, and the admitted evidence, the Court concludes that neither of the Debtors are entitled to a chapter 7 discharge.

## II.    JURISDICTION

This Court has jurisdiction of the subject matter and the parties pursuant to 28 U.S.C. §§ 1334 and 157(a) and Local Rule 77.4(a) of the United States District Court for the District of New Hampshire.  This is a core proceeding in accordance with 28 U.S.C. § 157(b).

## III.    FACTS

The following facts are based on the 147 stipulated facts contained in the parties' Joint Pretrial Statement (Doc. No. 41) ("JPTS"), the testimony of the witnesses, the exhibits admitted into evidence and the Court's own docket.[4]  Based upon the evidence presented and the record in this proceeding and the Bankruptcy Case, the Court makes the following findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052.

*The Debtors' Background*

Jonathan has a high school diploma and is a carpenter by trade.  Shawna is a hairdresser and the primary caretaker of the Debtors' two children.  Neither of the Debtors attended college. In late 2010, the Debtors commenced a chapter 7 case in this District with the assistance of counsel and received a discharge on March 29, 2011 (Bk. No. 10-15324-JMD, Doc. Nos. 1 and 16) (the "First Case").  A few years later, Jonathan incorporated GTC Construction Management Co. ("GTC") in the Commonwealth of Massachusetts, serving as its president, treasurer, secretary, CEO, CFO, assistant secretary, vice president, and sole director.[5]  GTC was a general

---

[4] The Court may take judicial notice of its docket. See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 196 F.3d 1, 8 (1st Cir.1999), cert. denied, 530 U.S. 1230 (2000) ("The bankruptcy court appropriately took judicial notice of its docket[.]").

[5] See Trial Tr. Vol. I at 132:4-6.

contracting company that worked on public and private construction projects.  Having worked in the construction industry and trades in various capacities, Jonathan handled estimations, project management, job meetings, employee management, and similar responsibilities for GTC.  To aid GTC's expansion, the Debtors and GTC executed a written general agreement of indemnity ("Indemnity Agreement") with Berkley on July 6, 2016.[6]  Pursuant to the Indemnity Agreement, Berkley issued nine performance and payment bonds on behalf of GTC, guaranteeing the fulfillment of certain construction projects that GTC was engaged to complete.  While GTC achieved approximately $13,000,000 and $15,000,000 in gross revenue in 2016 and 2017, respectively, its success was short lived.  For whatever reason, GTC was unable to complete or otherwise deliver on various bonded projects, causing Berkley, as surety, to carry the loss.  As a result, Berkley pursued and eventually obtained a partial judgment against the Debtors and GTC for contractual indemnity and common law indemnity in December of 2017.  About two months later, GTC commenced a chapter 7 bankruptcy case in the District of Massachusetts (Bk. No. 18-40236) (the "GTC Bankruptcy").[7]

Following GTC's bankruptcy, Jonathan pursued a career in real estate sales, obtaining his real estate licenses in Massachusetts and New Hampshire in March of 2018.  A year later, the Debtors joined Century 21 Northeast ("Century") as independent real estate agents.  While Jonathan focused on building his client list and generating sales, Shawna worked part-time assisting Jonathan during open houses and showings.  Jonathan's transition into real estate sales was met with delayed success.  In 2018, Jonathan generated approximately $37,000 in real estate

---

[6] Although Shawna signed the indemnity agreement, she was not involved with GTC's day-to-day operations.  <u>See</u> JPTS at ¶ 17.

[7] The parties incorrectly stipulated in paragraph 28 of their JPTS that GTC commenced a chapter 11 case.  While the case docket reveals otherwise, the error is not material here.

commissions and deducted over $60,000 of business-related expenses on his 2018 tax return.[8]  In 2019, Jonathan earned $123,000 in real estate commissions, deducting close to $84,000 in expenses.[9]  By employing his personal accountant and relying on his advice, Jonathan was able to bridge the income gap between GTC's failure and his delayed success as a realtor with approximately $100,000 in tax refunds that he obtained in the Spring of 2018.[10]  At some point, the Debtors' accountant advised Jonathan to incorporate his real estate business.[11]

By September of 2020, Jonathan's real estate career had gained momentum.  Anticipating significant commissions, Jonathan contacted his accountant to set up an S corporation to reduce his tax burden.[12]  On September 23, 2020, Jonathan incorporated Jonathan Keevers, Inc. (the "Corporation").  The next day, Jonathan opened a business checking account at Enterprise Bank in the Corporation's name (the "Corporate Account") and directed Century to deposit his real estate commissions into the Corporate Account.[13]  Century deposited his real estate commissions into the Corporate Account from October 1, 2020, to May 19, 2021.  The Debtors used the Corporate Account's debit cards and checks to purchase products and services.  While Jonathan was and remains the president, treasurer, secretary and director of the Corporation, Shawna's involvement with the Corporation was limited to assisting Jonathan with open houses, client development, and showings.

---

[8] See Trial Tr. Vol. I at 22:1-25 to 23:1-10; Exhibit 43 at 237.

[9] See Trial Tr. Vol. I at 26:7-13; Exhibit 44 at 256.

[10] See Trial Tr. Vol. I at 135:4-25 to 136:1-14.

[11] See Trial Tr. Vol. I at 23:21-25.

[12] See Trial Tr. Vol. I at 30:2-8.

[13] See Trial Tr. Vol. I at 121:20-24 to 122:1-20.

*The Bankruptcy Filing and Post-Petition Events*

On November 23, 2020, with the assistance of counsel, the Debtors filed a joint individual chapter 11 petition in this District (Bankruptcy Case, Doc. No. 1 at 1-7) (the "Petition").  The Debtors worked with their attorney to prepare the Petition and collect necessary information to complete it, and they reviewed the Petition and verified the information contained therein.[14]

Part 3 of the Petition required the Debtors to report any businesses that they own as sole proprietors.[15]  In response, somewhat inexplicably, the Debtors indicated that they were sole proprietors of the Corporation.  In Part 1 of their Schedule I, the Debtors described their respective employment status, occupations, and employers' names.[16]  There, the Debtors indicated that Jonathan was a realtor employed by Century for two years, while Shawna was employed as a hairdresser for six months.[17]  During the trial, Jonathan conceded that he did not schedule himself as being employed by the Corporation and stated that he held himself out as "Century" when conducting business.[18]  The Debtors' Schedules I and J showed monthly gross wages, salary, and commissions of $14,000, and net income of $3,200.[19]

In Part 4 of Schedule A/B, the Debtors were required to disclose their personal financial assets, including but not limited to bank accounts, stock, and interests in businesses.  The Debtors scheduled the Corporate Account as a "checking" account at "Enterprise Bank" with a

---

[14] See Trial Tr. Vol. I at 35:16-23.

[15] Part 3: Question 12 of the Petition defines a "sole proprietorship" as "a business you operate as an individual, and is not a separate legal entity such as a corporation, partnership, or LLC."  Joint Exhibit 1 at 4.

[16] See Joint Exhibit 1 at 171.

[17] See Joint Exhibit 1 at 171.

[18] See Trial Tr. Vol. I at 40:12-14 and 150:19-25.

[19] See Trial Tr. Vol. I at 176:17-24 to 177:1-2; Joint Exhibit 1 at 171 and 174.

balance of $12,000.[20]  On Schedule C, the Debtors claimed the Corporate Account as exempt under N.H. Rev. Stat. Ann. § 511:2(XVIII).[21]  While the Debtors did not indicate that the Corporate Account was the Corporation's bank account as opposed to their personal account,[22] they did disclose a 100% ownership interest in the Corporation.[23]  The Debtors signed the Petition, which their attorney also signed, and the Declaration About an Individual Debtor's Schedules under the penalty of perjury, declaring that they had read the summary and schedules and attesting to their truth and accuracy.[24]

The United States Trustee (the "UST") provided the Debtors with a copy of the Region 1 United States Trustee's Operating Guidelines and Reporting Requirements for Chapter 11 Cases (the "Operating Guidelines"), which they read.[25]  The Operating Guidelines required the Debtors to: (i) open a Debtor-in-Possession ("DIP") bank account, (ii) deposit their personal income into the DIP bank account, and (iii) pay their personal expenses from the DIP bank account.[26]  As a result, Jonathan opened a People's United Bank "Eplus" checking account with an account number ending in 8492 on November 24, 2020 (the "DIP Account").  The Debtors knew that

---

[20] See Joint Exhibit 1 at 20; Trial Tr. Vol. I at 41:19-25 to 42:1-10.

[21] See Trial Tr. Vol. I at 42:17-25 to 43:1; Joint Exhibit 1 at 24.

[22] During the trial, Jonathan acknowledged that despite having scheduled the Corporate Account as a personal checking account, he intended the Corporate Account to be a business account and viewed the Corporation as separate and distinct from himself.  See Trial Tr. Vol. I at 42:2-10.

[23] See Joint Exhibit 1 at 20.

[24] See Joint Exhibit 1 at 6 and 177.

[25] See Trial Tr. Vol. I at 54:2-3.

[26] See Trial Tr. Vol. I at 54:5-24.

they had to pay personal expenses from the DIP Account.[27]  Indeed, Jonathan had also discussed with his bankruptcy attorney where his income should be deposited.[28]

During the § 341 Meeting of Creditors held on January 5, 2021 (the "§ 341 Meeting"), the UST, the Subchapter V Trustee, and counsel to creditor HarborOne Bank examined the Debtors under oath.  The UST asked the Debtors whether "all funds received by [the Debtors] post-petition ha[d] been deposited into the [DIP Account]."[29]  In response, both Debtors indicated that they had.[30]  Regarding his employment status, Jonathan testified that he was employed by Century.[31]  Both the Subchapter V Trustee and HarborOne Bank's attorney inquired about the Debtors' use of the Corporation.  Jonathan confirmed that the Corporation was an S corporation, which conflicted with the Debtors' response to Part 3: Question 12 of the Petition, i.e. that the Corporation was a sole proprietorship.[32]  HarborOne Bank's attorney asked the Debtors to clarify that "when [the Debtors] list[ed] the expenditures and marketing and so forth, through the schedules, . . . that marketing [was] really done for [the Corporation] . . . ?"  In response, Jonathan confirmed that was, in fact, the case.[33]  Next, HarborOne's attorney asked Jonathan if the commissions listed on Schedule I were due to the Corporation, and Jonathan confirmed that they were.[34]  Jonathan further explained that the Corporation was "how [he]

---

[27] See Trial Tr. Vol. I at 54:11-16; JPTS at ¶¶ 55-57.

[28] See Trial Tr. Vol. I at 59:1-9.

[29] See Trial Tr. Vol. I at 147:3-10.

[30] See JPTS ¶¶ 60-63; Trial Tr. Vol. I at 46:5, 23.

[31] See Trial Tr. Vol. I at 51:4-15.

[32] See Trial Tr. Vol. I at 52:11-18.

[33] See Trial Tr. Vol. I at 52:19-24; JPTS at ¶¶ 68-69.

[34] See Trial Tr. Vol. I at 53:11-15; JPTS at ¶¶ 70-71.

operate[d] [his] real estate."[35]  At that time, Jonathan knew that Century was depositing his real estate commissions into the Corporate Account.[36]

At some point following the initial debtor interview and prior to late January 2021, Jonathan contacted Brian Tierney of the UST's Office with questions regarding the monthly operating reports and how to complete them.[37]  On January 27, 2021, the Debtors filed their individual chapter 11 monthly operating reports for the periods of November 2020 (Bankruptcy Case, Doc. No. 49; Joint Exhibit 2) (the "First MOR") and December 2020 (Bankruptcy Case, Doc. No. 50; Joint Exhibit 3) (the "Second MOR").[38]  In November of 2020, Jonathan was "having" Century deposit [his] sales commissions into the Corporate Account.[39]  Century deposited $12,627.37 of real estate commissions into the Corporate Account during that period.[40]  The First MOR showed total cash receipts of zero dollars for November of 2020.[41]  The Second MOR showed total cash receipts of $2,260.15 for December of 2020.[42]  During December of 2020, Century deposited $21,949.50 of real estate commissions into the Corporate Account.[43]  In response to Question 5 on the First MOR, which states "[h]ave you deposited all receipts for your business into the [DIP] [A]ccount[,]" Jonathan checked the box indicating that the question

---

[35] See JPTS at ¶ 74.

[36] See JPTS at ¶ 75.

[37] See Trial Tr. Vol. I at 143:1-16.

[38] The Court shall refer to the Debtors' monthly operating reports purporting to reflect transactions from the DIP Account as the "MORs," collectively.

[39] See Trial Tr. Vol. I at 66:3-8.

[40] See Joint Exhibit 9.

[41] See Trial Tr. Vol. I at 67:1-13 and 70:11-16; Joint Exhibit 2 at 2.

[42] See Joint Exhibit 3 at 2.

[43] See Joint Exhibit 10 at 2 and 5.

was not applicable.[44]  In response to Question 12 on the First MOR, which asks debtors whether they "[h]ave . . . sold or transferred any assets or provided services to anyone related to the DIP in any way[,]" Jonathan checked the "no" box.[45]  Jonathan prepared the First and Second MOR and all of the subsequent monthly operating reports in the case and in the same way.[46]  Although Jonathan signed the MORs under oath, attesting to the accuracy of the information contained therein, he did so on behalf of himself and Shawna.[47]

On January 27, 2023, Berkley filed a Bankruptcy Rule 2004 motion to examine the Debtors and require them to produce certain documents on or before February 5, 2021 (Bankruptcy Case, Doc. No. 51) (the "First 2004 Motion").  On January 28, 2021, the Court entered an order granting the First 2004 Motion (Bankruptcy Case, Doc. No. 55) (the "First 2004 Order").  Later that day, the Debtors moved for partial relief from the First 2004 Order (Bankruptcy Case, Doc. No. 57) (the "First Relief Motion"), which Berkley objected to (Bankruptcy Case, Doc. No. 64).  The Court scheduled the First Relief Motion for hearing on February 3, 2021.  On February 8, 2021, the Court entered an order ruling on the First Relief Motion (Bankruptcy Case, Doc. No. 71) (the "First Order"), which required the Debtors to:

(i)  contact all financial institutions with which they currently have accounts or had accounts since January 1, 2016, and obtain all available account statements for the periods between January 1, 2016 to the date of their request;

(ii) produce the records provided in response to their request to Berkley, the Subchapter V Trustee, and HarborOne's attorney by February 19, 2021; and

---

[44] See Joint Exhibit 2 at 1.

[45] See Joint Exhibit 2 at 1.

[46] See Trial Tr. Vol. I at 59:19-24 and 74:2-24.

[47] See Trial Tr. Vol. I at 59:25 and 60:1-4.

(iii) appear for a Zoom or other form of audiovisual examination at a mutually agreeable

time for the parties, no later than Friday, March 12, 2021, upon Berkley's request.

The First Order also extended the deadline to object to dischargeability of certain debts through

April 8, 2021.[48]

The Debtors filed their monthly operating report for the period of January 2021 on

February 16, 2021 (Bankruptcy Case, Doc. No. 74) (the "Third MOR").  Two days later, the

Debtors filed their Chapter 11 Subchapter V Plan dated February 18, 2021 (Bankruptcy Case,

Doc. No. 76) (the "Plan") and produced various financial documents and bank statements

pursuant to the First Order.[49]  On February 25, 2021, the Debtors produced, albeit late, printouts

of account activity for their People's United Bank Account (account number ending in #3477)

pursuant to the First Order.[50]  The Debtors filed their monthly operating report for the period of

February 2021 on March 15, 2021 (Bankruptcy Case, Doc. No. 84) (the "Fourth MOR").

On April 5, 2021, the Debtors moved to withdraw their Plan (Bankruptcy Case, Doc. No.

109), which the Court granted (Bankruptcy Case, Doc. No. 112).  On April 12, 2021, the Debtors

filed their monthly operating report for the period of March 2021 (Bankruptcy Case, Doc. No.

116) (the "Fifth MOR").  Four days later, the Debtors filed their First Amended Chapter 11

Subchapter V Plan dated April 16, 2021 (Bankruptcy Case, Doc. No. 117) (the "First Amended

Plan").  Following an April 21, 2021, hearing on the Debtors' objections to certain claims, the

Court ordered the Debtors to file a further amended plan by April 26, 2021 (Bankruptcy Case,

Doc. No. 119).  The Debtors timely filed their Second Amended Chapter 11 Subchapter V Plan

---

[48] The parties agree that the First Order was lawful.  See JPTS at ¶ 77.

[49] See JPTS at ¶ 80.

[50] See JPTS at ¶ 80.

dated April 26, 2021 (Bankruptcy Case, Doc. No. 121) (the "Second Amended Plan") and noticed it for a hearing on confirmation on June 11, 2021.

On May 14, 2021, the Debtors filed their monthly operating report for the period of April 2021 (Bankruptcy Case, Doc. No. 126) (the "Sixth MOR").  One week later, the Subchapter V Trustee sought, with the Debtors' assent, an extension of the deadline to object to confirmation of the Second Amended Plan, citing ongoing negotiations between the Debtors and interested parties (Bankruptcy Case, Doc. No. 130).  The Court granted the motion, extending the deadline to object to the Second Amended Plan to May 28, 2021 (Bankruptcy Case, Doc. No. 132).  On May 27, 2021, one day before the deadline to object to the Debtors' Second Amended Plan, the Debtors' attorney informed the Subchapter V Trustee that Century real estate commissions had been deposited into the Corporate Account, information that the Debtors had not shared with Berkley prior to that date.[51]

On June 2, 2021, nine days before the hearing on confirmation of the Second Amended Plan, the Debtors moved to continue the hearing, citing the alleged discovery that "the Debtors were utilizing two bank accounts which were not being reported on their [MORs]" (Bankruptcy Case, Doc. No. 139) (the "Motion to Continue Confirmation").  The Motion to Continue Confirmation further stated that it was "undisputed that [Jonathan] failed to fully disclose all income and expenses on his [MORs], which . . . [he] contend[ed] was . . . a result of a misunderstanding of the requirements for compliance with the [UST's] forms for disclosure" and that "all of the income and expenses disclosed with their proposed Second Amended Plan [were] significantly consistent with [their] actual cash income and expenses."[52]  The next day, the UST

---

[51] See JPTS at ¶¶ 143-44.

[52] See Motion to Continue Confirmation at ¶ 7.

moved an extension of the deadline to object to discharge (Bankruptcy Case, Doc. No. 141), which the Court extended to August 30, 2021 (Bankruptcy Case, Doc. No. 168).

On June 4, 2021, the UST moved for a Bankruptcy Rule 2004 examination of Century (Bankruptcy Case, Doc. No. 144) (the "Second Bankruptcy Rule 2004 Motion"). The same day, the Court held a hearing on the Motion to Continue Confirmation, during which the Debtors withdrew their Second Amended Plan. During the June 4 hearing, the Court ordered the Debtors to file a third amended plan by August 6, 2021, and set a deadline of June 18, 2021, for the Debtors to amend their MORs, "to the extent any amendments [were] necessary, for any reports filed in this case" (Bankruptcy Case, Doc. No. 145). On June 8, 2021, the Court granted the Second Bankruptcy Rule 2004 Motion (Bankruptcy Case, Doc. No. 148) (the "Second Bankruptcy Rule 2004 Order").

On June 11, 2021, more than three months after the February 19 disclosure deadline set by the First Order, the Debtors produced account statements for a bank account that they maintained at Merrimack Valley Federal Credit Union (the "Merrimack Account") from January of 2018 through September of 2020.[53]

On June 14, 2021, the Debtors filed their monthly operating report for the period of May 2021 (Bankruptcy Case, Doc. No. 152) (the "Seventh MOR") and seven monthly operating reports for the Corporation (Bankruptcy Case, Doc. Nos. 153-59) (collectively, the "Corporate MORs"). The Corporate MORs covered the same periods as the Debtors' MORs and purported to reflect transactions from the Corporate Account.[54] From January 27, 2021 to June 14, 2021, the Debtors' MORs were based on the DIP Account.[55] Like the MORs, the Corporate MORs

---

[53] See JPTS at ¶¶ 80, 83 and 84.

[54] See JPTS at ¶ 107.

[55] See Trial Tr. Vol. I at 60:5-23.

were prepared by Jonathan.[56]  Unlike the MORs, the Corporate MORs disclosed for the first time real estate commissions that Jonathan had earned as a Century real estate agent during the months of November of 2020 ($12,627.37), December of 2020 ($21,949.50), February of 2021 ($15,261.91), March of 2021 ($26,160.71), April of 2021 ($8,604.67), May of 2021 ($27,860.09), and June of 2021 ($42,390.89).[57]  On page 6 of the Corporate MOR for November of 2020, Jonathan reported a draw of $8,000 from the Corporate Account to the DIP Account.[58] The First MOR did not reflect an $8,000 transfer from the Corporate Account to the DIP Account.  On the Corporate MOR for December of 2020, Jonathan reported that $2,000 was deposited into the DIP Account from the Corporate Account.[59]  However, the Corporate Account statement attached to that Corporate MOR did not reflect that draw.[60]  In response to Question 5 on the Corporate MORs for November and December of 2020, which states "[h]ave you deposited all receipts for your business into the [DIP] [A]ccount[,]" Jonathan checked the box indicating that the question was not applicable.[61]  In response to Question 12 on the Corporate MORs for November and December of 2020, which states "[h]ave you sold or transferred any assets or provided services to anyone related to the DIP in any way[,]" Jonathan checked the "no" box.[62]

---

[56] See JPTS at ¶¶ 103-05.

[57] See JPTS at ¶¶ 108-21.

[58] See Trial Tr. Vol. I at 69:16-23; Joint Exhibit 9 at 6.

[59] See Joint Exhibit 10 at 6.

[60] See Joint Exhibit 10 at 11-12.

[61] See Trial Tr. Vol. I at 73:3-8; Joint Exhibit 9 at 1; Joint Exhibit 10 at 1.

[62] See Trial Tr. Vol. I at 73:9-13.

The Corporate MORs also disclosed for the first time significant expenses that were not reflected in the Debtors' MORs.  For example, the Debtors' First MOR did not include $6,464.59 of expenses reflected in the Corporate MOR for November of 2020.[63]  The Debtors' Second MOR did not include $2,885.41 of expenses reflected in the Corporate MOR for December of 2020.[64]  The Debtors' Third MOR did not include $2,567.78 of expenses reflected in the Corporate MOR for January of 2021.[65]  The Debtors' Fourth MOR did not include $1,489.23 of expenses reflected in the Corporate MOR for February of 2021.[66]  The Debtors' Fifth MOR did not include $3,993.92 of expenses reflected in the Corporate MOR for March of 2021.[67]  The Debtors' Sixth MOR did not include $1,078.66 of expenses reflected in the Corporate MOR for April of 2021.[68]  The Debtors' Seventh MOR did not include $2,016.06 of expenses reflected in the Corporate MOR for May of 2021.[69]

On June 17, 2021, Berkley filed a motion to compel the Debtors to comply with the First Order (Bankruptcy Case, Doc. No. 161), which motion Berkley amended on June 23, 2021 (Bankruptcy Case, Doc. No. 165) (together, the "Motion to Compel").  Berkley also moved for a Bankruptcy Rule 2004 examination of Century and production of documents (Bankruptcy Case, Doc. No. 162) (the "Third Bankruptcy Rule 2004 Motion").

---

[63] See JPTS at ¶¶ 122-23.

[64] See JPTS at ¶¶ 124-25.

[65] See JPTS at ¶¶ 126-27.

[66] See JPTS at ¶¶ 128-29.

[67] See JPTS at ¶¶ 130-31.

[68] See JPTS at ¶¶ 132-33.

[69] See JPTS at ¶¶ 134-35.

On July 14, 2021, the Debtors filed their monthly operating report for the period of June of 2021 (Bankruptcy Case, Doc. No. 174) (the "Eighth MOR") and the Corporate MOR for the same period (Bankruptcy Case, Doc. No. 175). The Debtors' Eighth MOR did not include $372.71 of expenses reflected in the Corporate MOR for June of 2021.[70] Two days later, Berkley moved for a Bankruptcy Rule 2004 examination of the Debtors' accountant, Paul Portrait, and a related request for production of documents (Bankruptcy Case, Doc. No. 176) (the "Fourth Bankruptcy Rule 2004 Motion").

On July 21, 2021, the Court extended the deadline for any interested party to object to discharge to September 30, 2021 (Bankruptcy Case, Doc. No. 183) and entered orders granting Berkley's Motion to Compel in part (Bankruptcy Case, Doc. No. 181) (the "Second Order"), the Third Bankruptcy Rule 2004 Motion (Bankruptcy Case, Doc. No. 180) (the "Third Bankruptcy Rule 2004 Order"), and the Fourth Bankruptcy Rule 2004 Motion (Bankruptcy Case, Doc. No. 182) (the "Fourth Bankruptcy Rule 2004 Order"). The Second Order required the Debtors to produce to Berkley and other interested parties "complete set[s] of statements, with checks deposited into and written out of, for all banking, investment or similar accounts in which they have, or have had, any interest and/or in which [they] have any right, title or interest, legal or otherwise, standing in their name or otherwise" from January 1, 2016 to July 21, 2021, by August 4, 2021. Id. Like the First Order, the parties agreed that the Second Order was lawful.[71]

On August 4, 2021, the Debtors produced various bank statements, DIP Account statements, financial account statements, and investment account statements.[72] On August 11, 2021, the Debtors filed their monthly operating report for the period of July 2021 (Bankruptcy

---

[70] See JPTS at ¶¶ 136-37.

[71] See JPTS at ¶ 79.

[72] See JPTS at ¶¶ 80, 82.

Case, Doc. No. 191) (the "Ninth MOR") and the Corporate MOR for the same period (Bankruptcy Case, Doc. No. 192). The Debtors' Ninth MOR did not include $1,481.97 of expenses reflected in the Corporate MOR for July of 2021.[73]

On August 24, 2021, twenty days after the Second Order's August 4 deadline, the Debtors produced account summaries for the Corporate Account.[74] Although the Debtors eventually produced the DIP Account statements and Corporate Account statements in response to the First and Second Orders, they failed to do so by the court-ordered deadlines of February 19 and August 4, 2021, respectively.[75]

On September 21, 2021, the Debtors filed their monthly operating report for the period of August 2021 (Bankruptcy Case, Doc. No. 199) (the "Tenth MOR") and the Corporate MOR for the same period (Bankruptcy Case, Doc. No. 200). The Debtors' Tenth MOR did not include $692.84 of expenses reflected in the Corporate MOR for August of 2021.[76]

On September 24, 2021, the Debtors amended their Statement of Financial Affairs, Schedule A/B, and Summary of Assets and Liabilities (Bankruptcy Case, Doc. No. 201), disclosing for the first time six rifles, three handguns, two "turkey tractors," a Kubota tractor, ski equipment, one Venmo account (which Jonathan described as a "pass-through" or "conduit" as opposed to an "account"), a May 5, 2020, paycheck protection program loan (the "PPP Loan") in the amount of $34,285, and a previously unreported 2018 federal tax refund in the amount of $112,579.[77] Three days later, the Debtors moved to extend the deadlines to file a further

---

[73] See JPTS at ¶¶ 140-41.

[74] See JPTS at ¶¶ 80, 85 and 86.

[75] See JPTS at ¶¶ 82, 86.

[76] See JPTS at ¶¶ 140-41.

[77] See Trial Tr. Vol. I at 36:3-9, 38:14-21, 39:5-15, and 139:21-25 to 140:1-6; Exhibit 35 at 5, 14.

amended plan and to object to discharge to October 15, 2021 (Bankruptcy Case, Doc. No. 202), which the Court granted the following day (Bankruptcy Case, Doc. No. 203).

On October 15, 2021, the Debtors filed their third amended plan (Bankruptcy Case, Doc. No. 208) (the "Third Amended Plan"). The Third Amended Plan disclosed the combined income and expenses from the DIP Account and Corporate Account,[78] and contemplated monthly payments of $3,446.67 to fund the plan, which was $246.67 more than the net income listed on the Debtors' Schedule J filed close to a year earlier.[79] The same day, Berkley commenced this adversary proceeding.

Ultimately unable to confirm a plan, the Debtors filed a motion to convert their chapter 11 case to a chapter 7 case on October 29, 2021, which the Court granted on December 22, 2021 (Bankruptcy Case, Doc. Nos. 218, 240, 243).

## IV.    THE COMPLAINT

The Complaint seeks the denial of the Debtors' discharge under Bankruptcy Code § 727(a)(3) (Count I), 727(a)(4)(A) (Count II), and 727(a)(6)(A) (Count III). In Count I, Berkley alleges that the Debtors concealed, without justification, the existence of recorded information from which their financial condition or business transactions could be ascertained by: (i) testifying during the § 341 Meeting that all funds received post-petition were deposited into the DIP Account, (ii) failing to report on their MORs Jonathan's real estate commissions and the Debtors' personal living expenses that were deposited into and paid from the Corporate Account, and (iii) representing in the Motion to Continue Confirmation that it was "discovered that th[ey]

---

[78] See Exhibit 108 at 31; Trial Tr. Vol. I at 178:7-13.

[79] See Exhibit 108 at 36; Trial Tr. Vol. I at 179:1-4. See also Exhibit 1 at 171 and 174; Trial Tr. Vol. I 176:17-24 to 177:1-2.

were using two bank accounts" and that Jonathan "was required to have a corporate entity to receive his commissions."

In Count II, Berkley alleges that the Debtors knowingly and fraudulently, in connection with their Bankruptcy Case, made false oaths or accounts by: (i) intentionally submitting inaccurate monthly operating reports that misrepresented their post-petition personal income and expenses; (ii) failing to attach all required bank statements to their MORs; (iii) testifying during the § 341 Meeting that all funds received post-petition were deposited into the DIP Account; and (iv) representing in the Motion to Continue Confirmation that they "discovered that [they] were using two bank accounts" and that Jonathan "was required to have a corporate entity to receive his commissions[]."

In Count III, Berkley alleges that the Debtors refused to obey the First Order and the Second Order, as evidenced by their belated supplementation of prior disclosures, their alleged failure to produce checks deposited into or written from all relevant accounts, their ongoing filing of misleading MORs and Corporate MORs, and their failure to amend their prior MORs and the Corporate MORs.

The Debtors deny these allegations, asserting that they complied with what they understood to be their duties and disclosure obligations including opening the required DIP Account, disclosing all transactions conducted through the DIP Account on their MORs, and supplementing their initial disclosures either willingly or in compliance with the Court's orders. Though the Debtors acknowledge their delayed disclosure of income and expenses deposited into or paid from the Corporate Account, and admitted to various ongoing deficiencies in their disclosures, they assert that it was all justified by their misunderstanding of their reporting requirements.  Specifically, the Debtors maintain that they believed that they were only required

to file monthly operating reports reflecting the transaction history of the DIP Account because only they, as opposed to the Corporation, were in bankruptcy.

## V.     THE TRIAL

During the trial, Berkley primarily relied on the testimony of the Debtors, the documents they submitted during the Bankruptcy Case and in connection with this proceeding, and the written deposition of their accountant, Paul Portrait.  The Debtors called one witness, Tracy Ibsen, a surety claim examiner employed by Berkley.  Both parties relied on various exhibits, the majority of which were admitted into evidence on the agreement of the parties or contain documents that appear on the docket of the Bankruptcy Case.

### *The Monthly Operating Reports*

Based on the evidence and testimony adduced at trial, the Court finds that the Debtors' MORs and the Corporate MORs were and remain inaccurate as they fail to reflect the Debtors' personal income and expenses deposited into or paid from the Corporate Account, and inaccurately report transfers between the DIP Account and Corporate Account.  The Debtors used the Corporate Account to pay for personal vacations in December of 2020, January of 2021, early February of 2021, and in May of 2021.[80]  While those expenses were eventually reported via the filing of the Corporate MORs, which did not occur until mid-June of 2021, they have never been reported as personal expenses on the Debtors' MORs.[81]  Vacation expenses were not the only category of personal expenses that the Debtors paid from the Corporate Account (either directly or through a conduit) and failed to report on their MORs.  Jonathan used the Corporate Account to pay for personal expenses at Tractor Supply, The Prime Butcher, and Hampstead

---

[80] See Trial Tr. Vol. I at 78:18-25; 79:1-6, 203:9-25 to 204:1-22 (Florida vacation and family ski trip); 209:9-12 (expenses at a Target, a Trader Joe's, and a Beall's located in Florida); 212:8-25 to 213:1-19 (expenses for trip to Florida); 216:10-24 to 217:1-8.

[81] See Trial Tr. Vol. I at 79:7-11.

Chiropractic (treatments for his back), Heavenly Donuts, and the Boston Polo Club, among other establishments.[82]  The Debtors also used Venmo to pay personal expenses from the Corporate Account.[83]

        During the trial, the Debtors' testimony appeared to suggest that a personal expense could be converted to a business expense and paid from the Corporate Account, and thus be beyond the scope of their disclosure obligations, simply by labeling it as such or finding some kind of intersection between the purchase and Jonathan's real estate business.  For example, Shawna's testimony suggested a greater degree of involvement on her part with client development and the Corporation's affairs to justify her use of the Corporate Account to pay for personal expenses. The Court finds that her use of the Corporate Account as described above was pervasive. Shawna used the Corporate Account to pay for personal expenses at Journey Kidz (a children's clothing store); Gap (a clothing store); American Eagle (a clothing store); Sephora (a makeup and beauty supply store); and Free People (a women's clothing store).  She also used the Corporate Account to pay for beauty services (checks payable to an esthetician named Lisa Ghijka and Billy's Nails); a Noom subscription (a web-based application for health and wellness); family groceries; the family's health insurance; and work performed on their home.[84] While Shawna testified that these and related purchasers were businesses expenses, or that she

---

[82] See Trial Tr. Vol. I at 84:1-25 to 85:1-18, 93:4-25; 94:1-25 to 95:1; 101:17-25 to 102:1-12, 105-106 (discussing payment of rides for Jonathan and/or his daughters), 186:18-25 to 187:2-9; Exhibits 30, 40, 49.

[83] See Trial Tr. Vol. I at 88:1-25 to 89:1-25 (using Venmo as conduit account to transfer $500 from the Corporate Account to a mortgage broker Jonathan worked with regularly).

[84] See Exhibit 30; Trial Tr. Vol. I 196:4-25 and 215:8-22 (health insurance); Trial Tr. Vol. I at 199:5-25 to 200:1-20 (Market Basket); Trial Tr. Vol. I at 202:23-25 to 203:1-6 (Noom); Trial Tr. Vol. I at 204:23-25 to 205:1-10 and 210:2-18 (check and payments to Lisa Ghijka for personal treatment); Trial Tr. Vol. I 215:23-25 to 216:1-4; Trial Tr. Vol. I at 206:4-16 (Sephora); Trial Tr. Vol. I at 206:17-23 (Journey Kids); Trial Tr. Vol. I at 206:24-25 to 207:1-8 (Gap); Trial Tr. Vol. I at 207:9-20 (American Eagle); Trial Tr. Vol. I at 209:14-25 to 210:1 (check written to AMK Property Maintenance) and 214:122 (cleaning services provided by Monica Richard).

could not recall whether she had made some of the purchases, the Court did not find her to be credible on this subject, and found her testimony evasive.[85]

Regarding his responses to Question 5 and 12 on the MORs and Corporate MORs, Jonathan acknowledged that the boxes he checked in response to those questions indicated that no money had moved from the Corporate Account to the DIP Account, which he admitted was inaccurate.[86]  During his testimony, Jonathan maintained that this was due to his misunderstanding of his reporting obligations and discussions with the UST prior to filing the Debtors' MORs.  Specifically, Jonathan testified that he did not disclose information about the Corporation or its income on the MORs because of a conversation he had with Mr. Tierney about how to complete the MORs prior to their filing in late January of 2021.[87]  During that conversation, Mr. Tierney allegedly told Jonathan that he did not have to pay the UST Quarterly Fees or list a NAISC Code on the MORs (which Jonathan referred to as a "business code") because the bankruptcy case was a personal bankruptcy.[88]  Relatedly, Shawna's testimony suggested that she was primarily responsible for managing the Debtors' home and their children and not involved with the completion of the MORs or the Corporate MORs, a point that Jonathan also emphasized in an apparent attempt to "shoulder the blame" for the alleged concealment or falsification of records.[89]

---

[85] See Trial Tr. Vol. I at 211:4-25.

[86] See Trial Tr. Vol. I at 73:13-18.

[87] See Trial Tr. Vol. I at 143:2-25.  While Mr. Tierney was listed on the Debtors' witness list (Doc. No. 36), he was not called to testify.

[88] See Trial Tr. Vol. I at 143 to 144:1-3.

[89] See Trial Tr. Vol. I at 193:18-23, 194:10-14, 196:7-13.

Jonathan's testimony emphasized his disclosure of excess information in relation to the First MOR, including a copy of a check made out to his attorney pre-petition (Exhibit 30), and the Debtors' ongoing effort to reorganize via the filing of the Third Amended Plan in October of 2021, which Jonathan argued was consistent with the disclosures made in their Petition and Schedules I and J.[90]  The Third Amended Plan disclosed the combined income and expenses from the DIP Account and Corporate Account,[91] and required $3,446.67 in monthly payments, which was $246.67 more than the net income listed on the Debtors' Schedule J filed close to a year earlier.[92]

The Debtors called Ms. Ibsen as a witness in support of their position that the MORs, their Third Amended Plan, and other documents produced were sufficient for Berkley to ascertain the Debtors' financial condition or business transactions.  During her testimony, Ms. Ibsen acknowledged that she "had enough [information] to have an overview of the [D]ebtors' financial condition" based on her review of the Debtors MORs, plans, bank statements, and deposition transcripts, and "to do an evaluation of the [D]ebtors' [financial] condition" as of the filing date of the Third Amended Plan.[93]  On cross-examination, Ms. Ibsen acknowledged that Berkley commenced this adversary proceeding on October 15, 2021, the same day the Debtors filed the Third Amended Plan.  The Court finds that the implication of Ms. Ibsen's testimony during direct and cross-examination was that she did not have enough cumulative information to

---

[90] See Trial Tr. Vol. I at 177:9-13.

[91] See Exhibit 108 at 31; Trial Tr. Vol. I at 178:7-13.

[92] See Exhibit 108 at 36; Trial Tr. Vol. I at 179:1-4; Exhibit 1 at 171 and 174; Trial Tr. Vol. I at 176:17-24 to 177:1-2.

[93] See Trial Tr. Vol. II at 15:1-15 to 17:1-10.

evaluate the Debtors' financial condition until the filing of the Third Amended Plan on October 15, 2021.

*Jonathan's Employment and The Century Commissions*

During the trial, Jonathan confirmed that he and his attorney discussed that his "pay" needed to be deposited into the DIP Account[94] and that he was "having" Century deposit his sales commissions into the Corporate Account in November of 2020.[95]  Jonathan did not disclose to Berkley or the Subchapter V Trustee that his Century real estate commissions were being deposited into the Corporate Account until after the filing of the Second Amended Plan.[96] During cross-examination, Jonathan testified that he believed he had accurately responded to the UST's question regarding whether "all of the funds received by [him and Shawna] post-petition had been deposited into a DIP account" because he and his wife had closed their personal bank accounts and deposited that money into the DIP Account.[97]  In his view, the Century real estate commissions that were going into the Corporate Account "had nothing to do with [their] personal bankruptcy."[98]  Jonathan further explained that he disclosed gross commissions of $189,000 that were received by the Corporation and reported for tax purposes for the year of 2020 during the § 341 Meeting.[99]  He also confirmed that the Century commissions were received by him, individually.[100]

---

[94] See Trial Tr. Vol. I at 58:12-25 to 59:1-9.

[95] See Trial Tr. Vol. I at 66:3-8.

[96] See Trial Tr. Vol. I at 63:18-25 to 64:1-16.

[97] See Trial Tr. Vol. I at 147:3-15.

[98] See Trial Tr. Vol. I at 147:18-21.

[99] See Trial Tr. Vol. I at 149:6-11.

[100] See Trial Tr. Vol. I at 149:12-14.

*Nondisclosure on the Statement of Financial Affairs & Bankruptcy Schedules*

During the trial, Jonathan explained that he did not disclose his 2018 tax refund on the Statement of Financial Affairs because he did not consider a tax refund income, reasoning that tax refunds were income that he had already earned.[101]  He also emphasized that he disclosed both the Corporation, his ownership of the Corporation, the Corporate Account, and the lender of the PPP Loan on the Debtors' Schedules.[102]  Jonathan further explained that he amended their schedules to include the missing documents following a deposition with the Subchapter V Trustee and did not include the items in his initial filings because "it was a stressful time and that was the last thing on his mind."[103]  During Berkley's redirect examination, Jonathan acknowledged that the tax refunds were in respect of taxes that GTC had paid, and that he got the tax refunds because his accountant took a net operating loss from GTC and applied it to him, personally.[104]

*The Debtors' Alleged Fraudulent Intent*

During the trial, the Debtors denied having any intent to misrepresent their income and expenses, asserting that any nondisclosure of their personal income and/or expenses was an oversight or due to Jonathan's misunderstanding of the Debtors' reporting requirements and/or the disclosure forms.  In support, Jonathan testified that he made full disclosure of his use of the Corporate Account and the Corporation at the start of the bankruptcy case.[105]  Specifically, he cited his disclosure of the Corporate Account on the Petition and Bankruptcy Schedules and his

---

[101] See Trial Tr. Vol. I at 137:18-25 to 138:3-6; Joint Exhibit 1 at 9.

[102] See Trial Tr. Vol. I at 137:15-17, 138:9-25, 139:1-13; Joint Exhibit 1 at 4, 19, 20, 143.

[103] See Trial Tr. Vol. I at 141:16-22.

[104] See Trial Tr. Vol. I at 184:11-25 to 185:1.

[105] See Trial Tr. Vol. I at 120-121.

testimony during the § 341 Meeting regarding the Corporation and Century's payment of his real estate commissions to the Corporation.[106] Jonathan also testified that he did not include the expenses and Century real estate commissions that were disclosed in the Corporate MORs on the Debtors' MORs because the Corporation was a separate and distinct entity, reasoning that he and his wife were in bankruptcy, not the Corporation.[107] As a result, he reported only his personal income deposited into the DIP Account from November 2020 on the MORs.[108] Jonathan also acknowledged that the MORs did not include personal expenses paid through the Corporate Account, but justified his failure to amend the MORs by citing the filing of the Corporate MORs.[109]

Regarding the Motion to Continue Confirmation, Jonathan testified that the statement in the motion stating that "he was required to have a corporate entity to receive his commissions so as to avoid any issues with him being determined to be an employee of that brokerage agency rather than an independent contractor" was not true.[110] During cross-examination, Jonathan testified that the statement was made in error by his attorney and that he had not reviewed the Motion to Continue Confirmation prior to its filing.[111] Addressing his prior inconsistent statement during a deposition that he may have reviewed the Motion to Continue Confirmation before it was filed, Jonathan explained that he had been reviewing a lot of documents at the time and was "familiar with seeing something before it [was] submitted [but] did not see [his]

---

[106] See Trial Tr. Vol. I at 120:21-25 to 121:1-12.

[107] See Trial Tr. Vol. I at 123:3-7; Exhibit 37 at ¶ 7.

[108] See Trial Tr. Vol. I at 127:2-3.

[109] See Trial Tr. Vol. I at 127:22-25.

[110] See Trial Tr. Vol. I at 121:20-24 to 122:1-20.

[111] See Trial Tr. Vol. I at 182:1-10; Exhibit 39 at 23.

signature on [the Motion to Continue Confirmation] so [he] was confused."[112]  He also emphasized that the deposition was seven hours long.[113]  Jonathan confirmed that he holds himself out as "Century" when he conducts business.[114]  Accordingly, he maintained that his testimony that he was "with Century . . . as a realtor in Massachusetts and New Hampshire" during the § 341 Meeting was truthful.[115]

Regarding the alleged "discovery" of the Corporate Account and payment of commissions into the Corporate Account, Jonathan explained that in May of 2021, he was copied on an email from the Subchapter V Trustee inquiring about the absence of the Corporation's expenses in the MORs.[116]  Jonathan testified that he was surprised by the email, immediately called his attorney, and answered the Subchapter V Trustee's questions.[117]  He explained that he was surprised by the question because "no one had – not one person involved in the case had ever once said, hey, where's your MORs for [the Corporation] . . . [a]nd that [he was] thinking it's an S corp.  It's a completely separate entity.  It's getting paid by Century[].  It's paying [his] salary."[118]

*The Debtors' Compliance with the First and Second Orders*

Jonathan was responsible for responding to and collecting all the information and documents ordered to be disclosed by the First and Second Orders.[119]  Jonathan did not disclose

---

[112] See Trial Tr. Vol. I at 182:14-16.

[113] See Trial Tr. Vol. I at 182:24.

[114] See Trial Tr. Vol. I at 150:19-25.

[115] See Trial Tr. Vol. I at 151:4-5.

[116] See Trial Tr. Vol. I at 155.

[117] See Trial Tr. Vol. I 156:6-15.

[118] See Trial Tr. Vol. I at 156:17-21.

[119] See Trial Tr. Vol. I at 123:16-23.

the DIP Account statements by the February 19 deadline.[120]  Despite the Subchapter V Trustee

having discovered that Jonathan's real estate commissions were being deposited into the

Corporate Account, the Debtors did not disclose the DIP Account Statements until being

compelled to do so by the August 4 deadline.[121]  And even then, Jonathan did not produce the

Corporate Account statements (checking account) until August 24.[122]  The parties further

stipulated that the Debtors failed to produce records of at least five bank accounts opened in the

Debtors' names by the First Order's February 19 deadline.[123]  Regarding the delayed production

of documents in January and June of 2021, Jonathan testified that he recalled at least one bank

initially telling him that it could not obtain copies of checks[124] and that it was not until after the

expiration of the First Order's February 19 deadline that a bank manager informed him that he

could obtain checks, but not electronically.[125]  Addressing his compliance with the Second

Order, Jonathan testified that he timely produced the required account documents but redacted

the entire number from the account due to a conversation he believed he had with Mr. Tierney

during the initial debtor interview.[126]  As a result, Jonathan explained that he had to go back to

every single institution that fell within the scope of the Second Order and reproduce the same

unredacted documents by the August 4 deadline.[127]  Jonathan also testified that he had produced

---

[120] See Trial Tr. Vol I at 124:1-28.

[121] See Trial Tr. Vol. I at 124:18-24 to 125:1; Exhibit 38.

[122] See Trial Tr. Vol. I at 125:12-25 to 126:1-14.

[123] See Trial Tr. Vol. II at 28:13-17.

[124] See Trial Tr. Vol. I at 168:17-25; Exhibit 110.

[125] See Trial Tr. Vol. I at 169:1-3; Exhibit 110.

[126] See Trial Tr. Vol. I. at 171:4-13; Exhibit 111.

[127] See Trial Tr. Vol. I at 171:19-23; Exhibit 111.

the partially redacted Corporate Account statements for the checking account prior to August 24 because they were filed with the Corporate MORs.[128]  Jonathan believed that the volume of production made by August 4, 2021, exceeded 300 megabytes and thousands of pages.[129]

## VI.   APPLICABLE LAW & ANALYSIS

### A.  Section 727(a)(3) – Unjustified Concealment of Recorded Information Relating to the Debtors' Financial Condition

Bankruptcy Code § 727(a)(3) directs the Court to grant a debtor a discharge unless:

> [t]he debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case.

11 U.S.C. § 727(a)(3).  "In exchange for a fresh start, a debtor must paint a basic picture of his financial condition and satisfactorily explain the disposition of his assets during the period leading up to the filing of his bankruptcy petition."  Harrington v. Simmons (In re Simmons), 810 F.3d 852, 855 (1st Cir. 2016) (discussing a debtor's duty to maintain books and records accurately memorializing his business affairs).  The purpose of this section is "to give interested parties and the court a reasonably complete picture of the debtor's financial condition . . . prior to bankruptcy."  Id. at 857 (citing Tucker v. Devine (In re Devine), 11 B.R. 487, 488 (Bankr. D. Mass. 1981).  As a result, this section requires the debtor to "provide enough information [to allow interested parties and the court] 'to trace the debtor's financial history, to ascertain the debtor's financial condition, and to reconstruct the debtor's business transactions.'"  Agai v. Mihalatos (In re Mihalatos), 527 B.R. 55, 65 (Bankr E.D.N.Y. 2015) (quoting Schackner v.

---

[128] See Trial Tr. Vol. I at 174:1-10; Exhibit 112.

[129] See Trial Tr. Vol. I at 176:12-16.

Breslin Realty Dev. Corp., No. 11-CV-2734 (JS), 2012 WL 32624, at 4* (E.D.N.Y. Jan. 5, 2012). Importantly, "this section does not require the party seeking [the denial of a debtor's] discharge to prove fraudulent intent." Browne v. Lombard (In re Lombard), Adv. No. 15-1036-BAH, 2016 WL 1254734, at *2 (Bankr. D.N.H. Mar. 30, 2016) (citing Razzaboni v. Schifano (In re Schifano), 378 F.3d 60, 70 (1st Cir. 2004))). Rather, debtors can be denied a discharge under Bankruptcy Code § 727(a)(3) regardless of their subjective intent to conceal financial information, as the standard is an objective one. See In re Simmons, 810 F.3d at 858.

"The initial burden is on the party objecting to discharge to prove . . . : (i) that the debtor 'concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information;' and (ii) that the recorded information was information 'from which the debtor's financial condition or business transactions might be ascertained.'" Lassman v. Mahfouz (In re Mahfouz), 529 B.R. 431, 445 (Bankr. D. Mass. 2014) (quoting Lassman v. Keefe (In re Keefe), 380 B.R. 116, 120 (Bankr. D. Mass. 2007)). "'Concealment' can take various forms. These include (i) the debtor's withholding of information about an asset in which he or she has an interest and that he or she is duty-bound to reveal and (ii) the debtor's ostensible transfer of title to an asset coupled with his or her secret retention of the benefits of ownership." In re Drumm, 524 B.R. 329, 404 (Bankr. D. Mass. 2015), aff'd, 15-CV-10184-LTS, 2015 WL 9911447 (D. Mass. Nov. 20, 2015) (discussing "concealment" in the context of claim under Bankruptcy Code § 727(a)(2)) (citing R.I. Depositors Econ. Prot. Corp. v. Hayes (In re Hayes), 229 B.R. 253, 259 (B.A.P. 1st Cir. 1999)). The plaintiff is not required to prove that the debtor intended to defraud it to prove a violation of Bankruptcy Code § 727(a)(3). See Carroll v. Prosser (In re Prosser), ADV 08-3011 JKF, 2012 WL 6737781, at *22 (Bankr. D.V.I. Dec. 20, 2012) (citing Meridian Bank v. Alten, 958 F.2d 1226, 1234 (3d Cir. 1992)).

Although Bankruptcy Code § 727(a)(3) provides for a justification defense, the debtor bears the "burden of proving justification . . . and his ability to prevail on such a defense turns on whether his asserted justification is objectively reasonable . . . ."  In re Simmons, 810 F.3d at 858 (citing Meridian Bank, 958 F.2d at 1234; In re Schifano, 378 F.3d at 68) (internal citations omitted)).  "An act is justified if it is right or appropriate in the circumstances."  In re Keefe, 380 B.R. at 121.  "The standard is that of a reasonably prudent person in the same or similar circumstances."  In re Simmons, 810 F.3d at 859 (citing Meridian, 958 F.2d at 1231).  See also Morse v. Marcelle (In re Marcelle), Adv. No. 07-1197-MWV, 2008 WL 4814116, *2 (Bankr. D.N.H. Oct. 30, 2008) ("The standard under [Bankruptcy Code §] 727(a)(3) is 'reasonableness in the particular circumstances,' taking into account the debtor's education and sophistication."). The Court "has reasonably wide discretion in determining whether the books and records produced are sufficient to meet the requirements of the statute."  Harman v. Brown (In re Brown), 56 B.R. 63, 66 (Bankr. D.N.H. 1985) (citing Broad Nat. Bank v. Kadison, 26 B.R. 1015 (D.N.J. 1983); In re Kottwitz, 42 B.R. 566 (W.D. Mo. 1984)).

"When a married couple shares a duty to maintain records, the Court must consider one spouse's reliance on the other in determining whether a failure to keep records was justified under the circumstances."  Massachusetts v. Bartel (In re Bartel), Adv. No. 07-01019, 2009 Bankr. LEXIS 2175, at *33 (Bankr. D. Mass. Aug. 10, 2009) (citing Cox v. Lansdowne (In re Cox), 904 F.2d 1399, 1402 (9th Cir. 1990) ("Having found a shared duty, the bankruptcy court said that [the debtor spouse] could not justify her failure to keep records because she relied on her husband for their maintenance.  We believe, however, that if she did in fact rely on [her husband] for record keeping, such reliance is relevant in determining 'justification' under [Bankruptcy Code] § 727(a)(3).  In any business relationship involving more than one person, the 'partners' will usually delegate responsibilities, including record keeping, among themselves.

Such delegation is even more likely to occur in cases like this one where the 'partners' are married, and one spouse has significantly more business experience, knowledge and expertise than the other.")).  See also Shaheen v. MacPherson (In re MacPherson), 101 B.R. 324, 326 (Bankr. M.D. Fla. 1989) (declining to deny a debtor wife, who was a homemaker, a discharge under Bankruptcy Code § 727(a)(3) and finding that the record did not establish that she, unlike the debtor husband, "actively participated in the disposition of any part of the funds involved," or "engaged in extensive commercial transactions which would require her to maintain books and records.").

### i.  Positions of the Parties

In Count I, Berkley seeks the denial of the Debtors' discharge under Bankruptcy Code § 727(a)(3) for their alleged unjustified failure to disclose Jonathan's Century real estate commissions and their personal living expenses on their MORs, and to disclose during the § 341 Meeting the existence of recorded information relating to their financial condition and business transactions.

The Debtors reject these contentions, arguing that any inconsistency or failure to disclose was reasonably justified.  Regarding the real estate commissions, the Debtors argue that the income earned by Jonathan is separate and distinct from the income earned by the Corporation. They also maintain that their MORs reflected Jonathan's personal income deposited into the DIP Account, and that expenses paid out of the Corporate Account were business expenses of the Corporation.  The Debtors maintain that they justifiably believed that they were required to only disclose the expenses and personal income deposited into or paid from the DIP Account.  They further contend that Shawna should not be denied a discharge because she justifiably relied on and delegated her duties to Jonathan.

ii. *Analysis*

The Court finds that Berkley proved by a preponderance of the evidence that the Debtors concealed or falsified recorded information from which their financial conditions or business transactions might be ascertained, without reasonable justification. The Debtors concealed personal expenses paid from the Corporate Account on their MORs by failing to accurately report and disclose on their MORs various personal expenses paid from the Corporate Account and related transfers, and to attach the required DIP Account statements and Corporate Account statements.[130] The MORs were and remain admittedly incomplete and inaccurate due to Jonathan's failure to correctly answer Questions 5 and 12 on the MORs and disclose personal expenses that were paid through the Corporate Account. Having found that the Debtors concealed information from which their financial condition could be ascertained, the Court must determine whether the Debtors' nondisclosure of such information was reasonably justified or that the records produced were sufficient to allow creditors to ascertain the Debtors' financial condition or business transactions.

The Debtors' justifications for the inconsistencies contained in their MORs and the Corporate MORs are unpersuasive and objectively unreasonable. The Debtors never amended the MORs or Corporate MORs, which Jonathan signed under the penalty of perjury and completed on behalf of himself and Shawna, despite being aware that the information contained in the MORs and Corporate MORs was inaccurate and/or incomplete. Had this been an isolated incident, limited to some of the MORs or Corporate MORs, or rectified by the filing of amended MORs and Corporate MORs, the Court may have found Jonathan's testimony more persuasive.

---

[130] Davis v. Choy, (In re Choy), 569 B.R. 169, 183 n.13 (Bankr. N.D. Cal. 2017) (noting that the debtor's "failure to attach his bank statements [to his monthly operating reports] may have constituted an impermissible "concealment" under [Bankruptcy Code] § 727(a)(3) but explaining that "the U.S. Trustee did not specifically allege . . . or argue th[at] in her [complaint or] post-trial brief[,]" and stating that the debtor should have disclosed . . . transfers " in his monthly operating reports).

However, on this record, the consistent and ongoing inaccuracies in the MORs, Corporate MORs, and attached financial statements cannot be overlooked or framed as objectively reasonable and justified.

Although the Debtors did not attend college, the Court finds that a lack of a college education did not contribute to or objectively justify the inaccurate disclosures contained in the MORs and Corporate MORs.  During cross-examination, Jonathan testified that his functions as GTC's president included estimating, project management, job meetings, and conferring with employees.[131]  He explained that he did not have any involvement with bookkeeping, which was handled by his bookkeeper.[132]  Nevertheless, Jonathan was financially savvy enough to employ both a personal accountant and a corporate accountant.[133]  By employing his personal accountant and relying on his advice, Jonathan was able to bridge the income gap between GTC's failure and his ultimate success as a realtor with approximately $100,000 in tax refunds that he obtained in the Spring of 2018.[134]  Jonathan's testimony regarding the formation and operation of GTC, which had annual gross revenues exceeding $13,000,000 and $15,000,000, his sophisticated strategy to reduce taxes (which involved the Corporation), and his employment as a real estate agent in two different jurisdictions, support an ability to understand his disclosure obligations and timely complete the required paperwork.

Moreover, the Court found Jonathan's testimony regarding his conversation with Mr. Tierney and his view of the Corporation as separate and distinct entity to be unpersuasive and self-serving.  First, the Debtors' Schedules, Petition, and MORs do not support Jonathan's

---

[131] See Trial Tr. Vol. I at 132:4-6.

[132] See Trial Tr. Vol. I at 132:14-18.

[133] See Trial Tr. Vol. I at 133:17-21.

[134] See Trial Tr. Vol. I at 135:4-25 to 136:1-14.

purported view of the Corporation as a clearly separate and distinct entity.[135]  He scheduled the Corporate Account without any indication that it belonged to the Corporation or was anything but a personal bank account.  Likewise, the Corporate MORs include the Debtors' personal expenses and the Corporation's business expenses, further blurring the line between the Debtors and the Corporation.  The Debtors never amended their MORs to include personal expenses paid through the Corporate Account.  On paper, the Debtors' actions blended the Debtors with the Corporation.  Second, Jonathan acknowledged that he read and understood the Operating Guidelines and related requirements regarding the DIP Account, his income, and expenses.  Nevertheless, his testimony (unconvincingly) suggested that he believed he could change the characterization of personal income or expenses by running it through the Corporation.  Even if that were the case, the Debtors did not accurately disclose the amounts of transfers (or, in some cases, the very existence of transfers) between the DIP Account and the Corporate Account on the MORs and Corporate MORs.  On this record, the Debtors' consistent failure to attach bank statements that reflect personal expenses paid from the DIP Account and/or the Corporate Account, and to correctly indicate whether transfers were made between the accounts on the MORs and Corporate MORs, was unreasonable and unjustified.

Shawna's testimony also supported her ability to participate in and understand her disclosure obligations.  She testified that she managed client relations for Jonathan's real estate business, paid bills from the Corporate Account (for both personal expenses and business expenses), had access to checks and debit cards from the Corporate Account, had obtained her real estate license, and participated in the Corporation's business (conducting showings, attending a closing, and hosting open houses).  In other words, Shawna was not an uninvolved,

---

[135] While it is true that the Debtors scheduled the Corporation on the Petition as a sole proprietorship, which (by definition) is not a separate and distinct legal entity, the Court does not base its finding on that misstatement alone. It likely evinces carelessness more than it does an intentional misstatement.

unsophisticated, or uneducated "homemaker"[136] who might justifiably rely on or delegate to her husband her disclosure obligations or other duties to collect and preserve records.  Although Shawna did not sign the MORs, she (as a chapter 11 debtor) had the same disclosure obligations and filing duties as Jonathan.  Permitting Jonathan to prepare the MORs and collect related financial statements for disclosure on her behalf did not absolve her of those duties.  Moreover, both Debtors were represented by counsel throughout their chapter 11 case and discussed their obligations with counsel.[137]  Although some courts have recognized a "justifiable reliance" defense where a joint debtor relies on or delegates their duty to maintain or preserve accurate records to their debtor spouse, the Court concludes (after considering her alleged reliance) that Shawna's delegation of her duties to maintain and disclose records to Jonathan was an insufficient "justification to relieve [her] from responsibility" when viewing the total circumstances of the case.  In re Bartel, 2009 Bankr. LEXIS 2175, at *34-35.

The Debtors are duty bound to accurately disclose a clear picture of their financial situation.  The Bankruptcy Code requires the filing of monthly operating reports and disclosure of the information contained therein to give creditors and other interested parties a clear understanding of a debtor's financials without requiring them to wade through paperwork or

---

[136] While Shawna began working part-time after the birth of the Debtors' children and appears to have taken on more responsibilities relating to the rearing of their children and the home, the record supports her involvement in and awareness of the Debtors' finances and the Corporation's finances and operations.  Thus, the Court does not liken her to the debtor-homemaker in In re MacPherson, who did not actively participate in the disposition of concealed funds or participate in her husband's business transactions.  See 101 B.R. at 326.

[137] "A petitioner cannot omit items from his schedules, force the trustee and the creditors, at their peril, to guess that he has done so—and hold them to a mythical requirement that they search through a paperwork jungle in the hope of finding an overlooked needle in a documentary haystack. Nor can an attorney's willingness to bear the burden of reproach provide blanket immunity to a debtor; *it is well settled that reliance upon advice of counsel is, in this context, no defense where it should have been evident to the debtor that the assets ought to be listed in the schedules*." Boroff v. Tully (In re Tully), 818 F.2d 106, 111 (1st Cir. 1987) (emphasis added).  See also Matter of Mascolo, 505 F.2d 274, 277 n. 4 (1st Cir. 1974); In re Russell, 52 F.2d 749, 754 (D.N.H. 1931).

make repeated requests for production.  In sum, the MORs and Corporate MORs, the timing of

the Corporate MORs' production, the ongoing inaccuracy of the MORs and Corporate MORs,

and the Debtors' failure to attach accurate supporting financial statements epitomize the "tug-of-

war" that Bankruptcy Code § 727(a)(3) is meant to deter.  Accordingly, the Court shall enter

judgment in favor of Berkley against the Debtors as to Count I.

      B.  Section 727(a)(4)(A) – False Oaths or Accounts

Under Bankruptcy Code § 727(a)(4)(A), a debtor will be denied a discharge where 'the

debtor knowingly and fraudulently, in or in connection with the case . . . made a false oath or

account . . . ." 11 U.S.C. § 727(a)(4)(A).  This section "seeks to insure that . . . chapter 7

debtor[s] [make] full, honest and accurate disclosure of [their] financial circumstances so the

bankruptcy trustee and creditors have sufficient information for the proper administration of the .

. . case without having to incur the time and expense of an investigation into [their] affairs."

Carto v. Oakley (In re Oakley), 503 B.R. 407, 424 (Bankr. E.D. Pa. 2013).  "The elements that

must be proved to avoid discharge [pursuant to Bankruptcy Code § 727(a)(4)] are (1) the debtor

knowingly and fraudulently made a false oath, and (2) the false oath related to a material fact in

connection to the bankruptcy case."  In re Schifano, 378 F.3d at 67 (citing In re Tully, 818 F.2d

at 110.  The plaintiff carries the burden of proof, but "'once it reasonably appears that the oath is

false, the burden falls upon the bankrupt to come forward with evidence that he has not

committed the offense charged.'"  Singh Educ. Servs. V. McCarthy (In re McCarthy), 488 B.R.

814, 825-26 (B.A.P. 1st Cir. 2013) (quoting In re Tully, 818 F.2d at 110 (citations omitted)).

A debtor's bankruptcy schedules and statement of financial affairs are submitted under

oath.  See Fed. R. Bankr. P. 1008 (stating that "[a]ll petitions, lists, schedules, statements and

amendments thereto shall be verified or contain an unsworn declaration . . . .").  "By federal

statute, an unsworn declaration made under penalty of perjury is the equivalent of a verification

under oath.[]  ABCD Holdings, LLC v. Hannon (In re Hannon), 512 B.R. 1, 14 (Bankr. D. Mass. 2014), subsequently aff'd, 839 F.3d 63 (1st Cir. 2016).  Thus, where a debtor "sign[s] [monthly operating reports] under the penalty of perjury, . . . his statements therein [are rendered] a statement under oath."  Id.  Accordingly, a "material 'false statement made in a bankruptcy petition, schedule[,] . . . statement of financial affairs[,]" or a monthly operating report "'constitutes a false oath'" under Bankruptcy Code § 727(a)(4)(A).  In re Oakley, 503 B.R. at 425.  "A debtor 'knowingly and fraudulently' makes a false oath if, despite knowing the truth, the debtor 'nonetheless willfully and intentionally swears to what is false.'"  In re Kupperstein, 61 F.4th 1, 8 (1st Cir. 2023) (quoting Hannon v. ABCD Holdings, LLC (In re Hannon), 839 F.3d 63, 72 (1st Cir. 2016) (quoting Lussier v. Sullivan (In re Sullivan), 455 B.R. 829, 837 (B.A.P. 1st Cir. 2011))).  Where the plaintiff produces persuasive evidence of a false statement under oath, the burden shifts to the defendant to prove that it was not intentionally false.  See In re Oakley, 503 B.R. at 426.  Because a debtor isn't likely to admit to its fraudulent intent, fraudulent intent may be inferred from the facts and circumstances of a case.  Id.  "Thus, reckless indifference to the truth can be inferred from numerous errors and omissions in the bankruptcy schedules or statement of financial affairs.  Id.

Although an omission or false statement resulting from an honest mistake or oversight is insufficient to deny a debtor a discharge, "an omission or misstatement made with a 'reckless indifference to the truth' will fall within the scope of [Bankruptcy Code] § 727(a)(4)(A) if the subject matter is material to the administration of the [case]."  In re Oakley, 503 B.R. at 425 (quoting In re Tully, 818 F.2d at 112 (noting that reckless indifference to the truth has been consistently treated as the functional equivalent of fraud for the purposes of [Bankruptcy Code] § 727(a)(4)(A))).  "A false oath is material if it 'bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and

disposition of property.'"  In re Kupperstein, 61 F.4th at 9 (quoting In re Hannon, 839 F.3d at 75

(quoting In re Sullivan, 455 B.R. at 829 (B.A.P. 1st Cir. 2011))).  "[T]he threshold to materiality

is fairly low."  Id. (quoting Premier Cap., LLC v. Crawford (In re Crawford), 841 F.3d 1, 8 (1st

Cir. 2016)).

### i.  Positions of the Parties

Berkley seeks the denial of the Debtors' discharge under Bankruptcy Code §

727(a)(4)(A), alleging that the Debtors knowingly engaged in fraudulent behavior in or in

connection with their Bankruptcy Case in various ways.  First, Berkley alleges that the Debtors

made false oaths during the § 341 Meeting.  Second, Berkley alleges that the Debtors made false

oaths by submitting monthly operating reports that inaccurately represented their personal

income and expenses.  Third, Berkley alleges that the Debtors made false oaths by representing

in the Motion to Continue Confirmation that it was "discovered" that the Debtors were using two

bank accounts (as opposed to just the DIP Account), which Berkley contends was already a

known fact, and that Jonathan "was required to have a corporate entity to receive his

commissions[.]"  In support, Berkley maintains that the Debtors used the Corporation and the

Corporate Account as a part of their alleged scheme to defraud and hide personal income and

expenses from their creditors.  Berkley asserts that the timing of the organization of the

Corporation and opening of the Corporate Account, the Debtors' delayed production of the

Corporate MORs and disclosures in their amended petition and schedules, the ongoing

inaccuracy of both the Corporate MORs and the Debtors' MORs, and Jonathan's admittedly

false statement that he was required to have a corporate entity receive his commissions evinces

the Debtors' fraudulent intent at worst, or a reckless indifference for the truth, at best.

The Debtors reject these contentions, asserting that they acted in good faith and

endeavored to make accurate and full disclosures of their finances and related documents from

the start of the Bankruptcy Case.  They contend that any nondisclosure or delayed disclosure of information on their Petition, MORs, Corporate MORs, or in response to the Court's First and Second Orders was either due to a misunderstanding of their disclosure obligations as to the Corporation and the Corporate Account or an innocent oversight.  The Debtors further assert that Jonathan's pre-petition organization of the Corporation and the Corporate Account is not evidence of fraudulent intent, but an honest and legitimate strategy to reduce their tax obligations.

### ii.  Analysis

The Debtors' MORs and the Corporate MORs were signed by Jonathan (on his and Shawna's behalf) under the penalty of perjury.  The MORs were and remain false because they omit personal income and expenses of the Debtors and incorrectly indicate whether amounts were transferred between the DIP Account and the Corporate Account and the amounts of said transfers.  The MORs also failed to include the bank statements supporting the transfers alleged therein when filed (and still do not include the statements from the Corporate Account reflecting payment of personal expenses from that account).  The false statements reflected in the MORs and Corporate MORs are material because they directly relate to the Debtors' business transactions and bankruptcy estate, and could (and did) lead to the discovery of the Century real estate commissions, the Corporation's business dealings, and the disposition of the Debtors' personal income and expenses.  See Brisman v. Parasram (In re Parasram), 647 B.R. 1, 21 (Bankr. E.D.N.Y. 2022) (explaining why the debtors schedules and monthly operating reports contained false oaths).  Jonathan knew the MORs (and the Corporate MORs) were inaccurate.

Although Jonathan testified that he omitted personal expenses in error and answered Questions 5 and 12 incorrectly by mistake, the Court does not find that testimony credible.  Both the number and materiality of the inaccuracies and omissions in Debtors' MORs and Corporate

MORs eliminate the possibility of mere negligence or oversight.  See In re Khalil, 379 B.R. 163, 175 (B.A.P. 9th Cir. 2007) (explaining that "multiple omissions of material assets or information may well support an inference of fraud if the nature of the assets or transactions suggests that the debtor was aware of them at the time of preparing the schedules and that there was something about the assets or transactions which, because of their size or nature, a debtor might want to conceal.").  See also In re Kupperstein, 61 F.4th at 7-8 (holding that the debtor—a chapter 7 attorney by profession—made a false oath by omission where he omitted his law practice income from his statement of financial affairs and interests in real property from his bankruptcy schedule A/B); In re Oakley, 503 B.R. at 426 ("[A] debtor cannot, merely by playing ostrich and burying his head deeply enough in the sand, disclaim all responsibility for statements which he has made under oath.").  As a result, the Court finds that Jonathan made false statements with reckless indifference to the truth on behalf of himself and Shawna.  Accordingly, Berkley has carried its burden by a preponderance of the evidence as to the MORs and Corporate MORs.

The Debtors made false statements in their Motion to Continue Confirmation, which stated that "it was discovered that [they] were using two bank accounts" and that Jonathan "was required to have a corporate entity to receive his commissions."  The Motion to Continue Confirmation was reviewed by Jonathan and submitted by the Debtors' attorney on their behalf. The statement that "it was discovered that the Debtors were using two bank accounts" was materially misleading, because Jonathan knew that he was receiving his Century real estate commissions in the Corporate Account (and had been since October of 2020).  The Debtors were aware that the Century commissions were being deposited into the Corporate Account well before the filing of the Motion to Continue Confirmation because Jonathan directed Century to deposit the commissions into the Corporate Account in October of 2020.  Likewise, Shawna knew about the existence of the Corporate Account and the commissions being placed in that

account because she used the Corporate Account to pay for various personal expenses. The statement that Jonathan "was required to have a corporate entity to receive his commissions" was admittedly false. Jonathan acknowledged that there was no such requirement.[138]

The Court finds that the Debtors knowingly made these false statements in the Motion to Continue Confirmation to mitigate their: (i) reckless disregard for their disclosure obligations, (ii) consistent use of the Corporate Account (as opposed to the DIP Account) to pay for a significant amount of personal expenses, and (iii) untimely disclosure of Century commissions earned by Jonathan, which were not disclosed until June 14, 2021. Nevertheless, the Court declines to find that these false statements constitute "false oaths" under Bankruptcy Code § 727(a)(4)(A). Here, neither of the Debtors (either individually or on behalf of the other joint debtor) signed the Motion to Continue Confirmation under the penalty of perjury or otherwise verified the statements contained therein pursuant to Bankruptcy Rules 1008 and 9011(a) and (e) or 28 U.S.C. § 1746. See Fed. R. Bankr. P. 1008 (stating that "[a]ll petitions, lists, schedules, statements and amendments thereto shall be verified or contain an unsworn declaration as provided in 28 U.S.C. § 1746"); Fed. R. Bankr. P. 9011(a) (requiring "[a] party who is not represented by an attorney [to] sign all papers."); Fed. R. Bankr. P. 9011(e) (stating that "[e]xcept as otherwise specifically provided by these rules, papers filed in a case under the [Bankruptcy] Code need not be verified. Whenever verification is required by [the Bankruptcy R]ules, an unsworn declaration as provided in 28 U.S.C. § 1746 satisfies the requirement of verification."); 28 U.S.C. § 1746 (governing unsworn declarations under penalty of perjury). Consequently, the false statements contained in the Motion to Continue Confirmation, while material, are not "false oaths" supporting the denial of the Debtors' discharge. See Looney v. Owens (In re Looney), Adv. No. 05-1706, 2006 WL 6589904, at *6 n.1 (Bankr. N.D. Ga. Feb. 3,

---

[138] See Trial Tr. Vol. I at 121:20-24 to 122:1-20.

2006) (finding that the debtor's discharge was not subject to denial under Bankruptcy Code §

727(a)(4)(A) where an allegedly false statement was contained in the debtor's motion to

reconsider, which the debtor did not sign under the penalty of perjury or otherwise verify);

Scovell v. Kunec (In re Kunec), 27 B.R. 650, 652 (Bankr. D. Pa. 1982) (stating that "[false]

statements which are not under oath or formally verified are not sufficient" for the purposes of

Bankruptcy Code § 727(a)(4)(A)); Gordon v. Gorman (In re Gorman), 14 B.R. 776, 777 (Bankr.

N.D. Ala. 1981) (finding that the making of a false statement alone did not constitute grounds to

deny a discharge).

The Debtors made false statements under oath during the § 341 Meeting when they

confirmed that "all funds received post-petition were deposited into the DIP Account."  As

explained herein, the Debtors knew that Jonathan's Century real estate commissions were being

deposited into the Corporate Account since October of 2020.  Moreover, Jonathan's attempts to

make a distinction between his "pay" and the real estate commissions that he himself directed

Century to deposit into the Corporate Account are a nonstarter.  Indeed, the First Circuit has

rejected such parsing of words.  See In re Kupperstein, 61 4th at 8 (rejecting an argument by a

debtor, who was also a chapter 7 attorney, that he was not required to disclose income because

he was an independent contractor and had no income from employment under state law, and

stating that "[h]owever [the debtor] define[d] himself under state law, he failed to disclose

income, a term defined broadly in the Bankruptcy Code.") (citing 11 U.S.C. § 101(10A)

(defining "current monthly income" as the "average monthly income from all sources that the

debtor receives . . . without regard to whether such income is taxable income"); Fed. R. Bankr. P.

9009(c) (requiring construction of bankruptcy forms in a manner consistent with the Federal

Rules of Bankruptcy Procedure and the Bankruptcy Code))).  The statement was clearly material

as it relates to the Debtors' finances, business dealings, assets, and the disposition of their

income, and made with a reckless disregard of their disclosure obligations.  The Internal

Revenue Code is not the Bankruptcy Code.  Consequently, what may be a legitimate strategy to

reduce tax liability under the former can have the appearance of a scheme to defraud creditors or

avoid disclosure under the latter.

      For these reasons, the Court finds that Berkley has proved by a preponderance of the

evidence that the Debtors made false oaths and/or accounts during the § 341 Meeting and in their

MORs and Corporate MORs.  Accordingly, the Court shall enter judgment in favor of Berkley

against the Debtors as to Count II.

      C.  Section 727(a)(6) – Willful Refusal to Comply with Court Orders

      Bankruptcy Code § 727(a)(6)(A) bars a debtor's discharge where "the debtor has refused,

in the case—to obey any lawful order of the court, other than an order to respond to a material

question or to testify . . . ."  11 U.S.C. § 727(a)(6)(A).  "Under [Bankruptcy Code] §

727(a)(6)(A) the initial burden of presenting evidence, as well as the ultimate burden of

persuasion, rests upon the plaintiff/ objecting party."  In re Spalt, 593 B.R. 69, 91 (Bankr. D.

Mass. 2018) (citing Fed. R. Bankr. P. 4005).  Berkley "must establish the facts warranting denial

of the discharge by a preponderance of the evidence."  Id.  Because "[t]he Bankruptcy Code does

not define 'refused' or 'refusal' . . . courts must interpret statutes according to their clear and

ordinary meaning."  Id. (quoting Gillman v. Green (In re Green), 335 B.R. 181, 183 (Bankr. D.

Utah 2005)).  See also Riley v. Tougas (In re Tougas), 354 B.R. 572, 578 (Bankr. D. Mass.

2006).  The word "refuse" means to "[t]o deny, decline, reject.  'Fail' is distinguishable from

'refuse' in that 'refuse' involves an act of the will, while 'fail' may be an act of inevitable

necessity."  In re Spalt, 593 B.R. at 91 (quoting Black's Law Dictionary 1153 (5th ed. 1979)

(citing Maestas v. Amer. Metal Co. of New Mexico, 37 N.M. 203, 20 P.2d 924, 928

(1933))).  See also In re Green, 335 B.R. at 184 (reviewing the definition of "refusal" in Black's

Law Dictionary and stating "[t]he import of [the] definition is that [Bankruptcy Code] §

727(a)(6)(A) requires a plaintiff to show more than a mere failure to obey a lawful court order.

The plaintiff must show some degree of volition or willfulness on the part of the debtor in failing

to comply with the order.").  Indeed, this Court has observed that "[Bankruptcy Code] §

727(a)(6)(A) requires the Court to go further than to simply find that a debtor failed to comply

with a discovery request.  Rather, it must find that the disobedience was willful or

intentional."  D'Agnese v. Cotsibas (In re Cotsibas), 262 B.R. 182, 186 (Bankr. D.N.H. 2001).  If

the Court determines that the Debtors' failure to comply with the First Order and Second Order

was willful or intentional, the Court must "determine . . . whether . . . [their] actions rise to the

level sufficient to warrant a denial of discharge.  Whether particular violations of its orders are so

serious to warrant a denial of discharge is a matter that is within the Court's discretion."  Id.

### i. Positions of the Parties

Berkley seeks the denial of the Debtors' discharge under Bankruptcy Code §

727(a)(6)(A) based on their alleged willful refusal to obey the Court's First Order and Second

Order, which Berkley contends required the Debtors to make full and timely document

production.  In support, Berkley cites the non-production and/or partial production of documents,

bank statements or other account statements that led to the filing of the First and Second Orders,

the stipulated fact that at least five bank accounts in the Debtors' names were not produced by

the deadline in the First Order, and the production of the Corporate Account statements for the

checking account on August 24, 2021.  The Debtors assert that they complied with or attempted

to comply with the First and Second Orders and their general disclosure obligations from the

start of the case.  In support, they cite their production of documents starting on January 14,

2021, and continuing throughout the bankruptcy case, the sheer volume of documents produced,

their supplementation of the MORs with the Corporate MORs starting on June 14, 2021, and their participation in lengthy depositions.

> *ii.  Analysis*

Berkley did not establish by a preponderance of the evidence that the Debtors intentionally or willfully refused to comply with the Court's First Order or Second Order. Although production was delayed, the testimony given at trial and the records in this case reflect an ongoing effort, albeit untimely and (at times) poorly executed, to comply.  The sheer volume of production in this case (300 megabytes and thousands of pages of financial documents) and the combined scope of records that the Debtors were required to produce pursuant to the First and Second Orders reflects, at a minimum, a good faith attempt to comply with the orders. While the parties stipulated to the Debtors' untimely disclosure of five bank accounts in the Debtors' names and the DIP and Corporate Statements, the Court believes that it is more likely that the Debtors (specifically, Jonathan as he was the debtor tasked with collecting the documents) failed to timely produce these documents due to oversight or, equally possibly, overwhelm.  Although Jonathan's testimony was not persuasive throughout the entire case, the Court found his testimony regarding his efforts to obtain checks and bank statements credible. For these reasons, the Court cannot deny the Debtors a discharge under Bankruptcy Code § 727(a)(6).

## VII.    CONCLUSION

For the foregoing reasons, judgment shall enter in favor of Berkley on Counts I and II, but not on Count III.  This opinion constitutes the Court's findings of fact and conclusions of law in accordance with Bankruptcy Rule Procedure 7052.  The Court will issue a separate judgment consistent with this opinion.

ENTERED at Concord, New Hampshire.


Date:   August 1, 2023                    /s/ Bruce A. Harwood
                                          Bruce A. Harwood
                                          Chief Bankruptcy Judge